**FILED**

JUL 3 1 2008

Clerk, U.S. District and
Bankruptcy Courts

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROGELIO ACOSTA
SAN JUAN, SAN NARCISO
2205 ZAMBALES
REP. OF THE PHILS.

VS.

THE HONORABLE DONALD C. WINTER
SECRETARY OF THE NAVY
DEPARTMENT OF THE NAVY
HUMAN RESOURCES OFFICE
(YOKOSUKA, JAPAN)
PSC 473, BOX 22, N134
FPO AP 96349-0022

Case: 1:08-cv-01318
Assigned To : Bates, John D.
Assign. Date : 7/31/2008
Description: Employ. Discrim.

## COMPLAINT

I filed a discrimination complaint through the United States
Department of the Navy, Human Resources Office, (Yokosuka, Japan),
PSC 473, Box 22, N134, FPO AP 96349-0022, about the Department's
noncompliance in the implementation of Office of Personnel
Management's (OPM), about Public Law No. 100-238, Section 110,
that provided to any individual meeting the definition of an
"employee" as defined at 5 United States Code (USC), section
8331(1) to avail of having to make a deposit to the Civil Service
Retirement and Disability Fund (Fund) for those employees of the
Federal Government where no timely retirement deductions to the
fund were withheld from their salary. The Department of the Navy
under the law, was the sole agent of OPM in this matter, failed
to inform me (us) about the law's implementing rules and
regulations during the time frame mentioned under the law

RECEIVED
JUL 14 2008
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

1

from January 8, 1988 until January 8, 1990, and when the Navy left the Philippines in November 1993, and later came to know about the law in 2007, and did filed a claim for discrimination. The Department's rejected my claim on the ground that I have no right to come within Title VII of the Civil Rights Act of 1964, as amended pursuant to 29 Code of Federal Regulation (CFR) 1614.103 (c) 4 which provided that "aliens employed in positions, or who apply for positions, located outside the limits of the United States" are not covered under Title VII.

The dismissal of the complaint read in pertinent part as follows:

> The dismissal of this complaint is not based on the merits of the complaint's claim that he should have been covered under the civil service retirement system. The dismissal of the instant case is based solely on the employee's status as a non-U.S. citizen and therefore he has no standing to file a claim of discrimination under the provisions of reference (c).

Citizenship in the United States—Every sovereign state determine for itself the circumstances which shall be recognize as creating natural or native-born citizenship, as well as the conditions under which an alien may be admitted to membership in its citizen body. Many states adopted their general principle the jus sanguinis, accordingly to which the children take citizenship of the father, or, if illegitimate of the mother. Other states accept the rule of jus soli, according to which a person becomes a citizen of the state within whose terreitotial limits he is born. This latter rule is constitutionally obligatory upon the United States ("US").

2

As a result of the Spanish-American War, the US acquired certain territory the inhabitants of which were held to be neither aliens or citizens of the United States.

Spain ceded the Philippine Islands, Guam, and Porto Rico to the US under the terms of the "Treaty of Peace" signed in Paris December 10, 1898.

In England, a citizen was a person who was born in that country and remained under its jurisdiction. In the rest of Europe citizenhsip was determined by parental nationality. The English version was the prevailing assumption in America. These two doctrines existed at the time the US Constitution was written.

The Fourteenth Amendment to the US Constitution, ratified in 1868 the first sentence of the amendment state that "(a)ll persons born or naturalized in the United States' and subject to its jurisdiction are citizens of the US and of the state where they reside. (See Civil War Amendments).

Following the transfer from Spain of the Philippine Islands to the US in Article III of the Treaty of Paris of December 10, 1898, see 30 Stat. 1254, which ended the Spanish American War. President McKinley established a civil authority over the Philippines known as the Philippine Island Commission. The powers and duties of the Commission were set forth in Presidential Instructions to the Commission dated April 7, 1900, and reaffirmed by Executive Order (unnumbered) dated June 21, 1901. By the Act of July 1, 1902, 32 Stat. 691, Congress expressly ratified both the Presidential

Instructions and the Executive Order. See <u>Ivanhoe Irrigation District v. McCracken</u>, 357 U.S. 275, 293-94 (1958) The Presidential Instructions vested the Commission, effective September 1, 1900, with "that part of the power of government in the Philippines Islands which is of a legislative nature" until Congress provided otherwise or a different central government was established.

The Act of July 1, 1902, in addition to ratifying the President's orders establishing the Philippine Commission, clearly indicated that, while the Philippines were subject to the sovereignty of the US, they were not to be deemed a part of the US for purposes of the applicability of federal statutes generally. Section of the Act of Congress of July 1, 1902 in Public No. 235, it provides:

> An Act to <u>temporarily</u> to provide for the administration of Civil Government in the Philippine Islands, and for other purposes.

Section 1 of the 1902 Act stated as follows:

> The provisions of section 1891 of the Revised Statutes of 1878 shall not apply to the Philippine Islands.

Section 1891, referred to above, provided that:

> The Constitution and all laws of the United States which are not locally inapplicable shall have the same effect within all organized Territories, and in every Territory herafter organized as elsewhere within the United States.

In addition, Congress specifically provided for citizenship for inhabitants of the Philippines that was separate from United States citizenship. Section 4 of the Treaty of Paris contained a listing of Philippine citizenship. It read:

4

4. That all inhabitants of the Philippine Islands continuing to reside therein who were Spanish subjects on the eleventh day of April, eighteen hundred and ninety-nine, and then reside in said Islands, and their children born subsequent thereto, shall be deemed and held to be citizens of the Philippine Islands and as such entitled to the protection of the United States except such as shall have elected to preserve their allegiance to the Crown of Spain in accordance with the treaty of peace between the United States and Spain signed at Paris December tenth, eighteen hundred and ninety-eight.

The object of these temporary provisions were to maintain the responsibility of the US for the general conduct of the Civil Government prior to the inauguration of the Philippine Commonwealth Government, at the end of which the islands were to become a "state."

Congress passed the so-called "Tydings-McDuffie act," approved by the President on March 24, 1934, called the "Independence Act of 1934." This Act have brought a change in the status of the islands, and thus created the "Commonwealth of the Philippines" attaining its new standing as "COMMONWEALTH OF THE PHILIPPINE ISLANDS," as now a "'state'" though not an independent state. See attached copy of a National Archives reference report relating to US Treaties and International Agreements, part of which, analyzing the status of the newly created "COMMONWEALTH OF THE PHILIPPINE ISLANDS," as part of the Union of American states.

Both the Acts of Congress and the ordinance appended the Constitution of the Commonwealth of the Philippine Islands show clearly that it was intended that full sovereignty over the Philippines was to be retained by the US during the transition

5

period of ten years (November 15, 1935 to July 3, 1946), provided
for in the Act. They show that, while the government of the
Philippine Islands was to have a large measure of self-government,
they were not to constitute a separate state under the rules of
international law. In other words, it was clearly intended that
the United States and the Philippine Islands should constitute a
single state.

Therefore, under the default rule in the Treaty of Peace, those
born on and after November 15, 1935 but before July 4, 1946,
were citizens of the United States under the doctrine of "jus
soli," they being borned in the continental US where they reside,
and were also citizens of the Philippine Islands (dual citizenship)
as called for under the US CONSTITUTION in its Fourteenth
Amendment.

I was born in then state of the Commonwealth of the Philippine
Islands, on December 19, 1938, with dual citizenship. Thus, I met
the conditions of citizenship under the FOURTEENTH AMENDMENT
definition of a (US) citizen. In
In Afroyim v. Rush, (1967) the Supreme Court of the United States,
held, 5-4, that Congress has no power "to take away an American
citizenship without his assent."

Since then I never went into open court (US Court) to renounce
any of my dual citizenship.

6

I am requesting this Honorable court to confirmed my having been born a US citizen under the provision of the "jus soli," doctrine when then Philippine Islands, attained its status as a new state, under title of "COMMONWEALTH OF THE PHILIPPINE ISLANDS" where the state had been clothed with the provisions of the US Constitution, specifically under the Fourteenth Amendments of the US Constitution. I ask for a _trial by jury_ in this case, and am _not_ specifying an amount of money, but, rather ask the Honorable court to confirmed by having been born a US citizen, and thus, the Department of the Navy allow me to have access under the Civil Rights Act of 1964, Title VII, as amended.

Accordingly, the Commission has, consistently held that claims of national discrimination brought by foreign nationals employed by agencies outside the United States do not come within the purview of the EEOC Regulations. Fogarty v. Department of State, appeal No. 01974143 (August 6, 1998).

As I have proven by evidence that I was born a U.S. citizen by birth, though residing in a foreign country, the cited decision by the Commission is inapplicable to my case.

Enclosures
Printed copy of the treaty of Paris, from Treaties and Other International Agreements of the United States of America, 1776-1949, edited by Charles I. Bevans
Copy of a National Archives reference report relating to United States Treaties and International Agreement, analyzing the status of the newly created "Commonwealth of the Philippine Islands."

Respectfully submitted,

*Rogelio Acosta*
Rogelio Acosta
San Juan, San Narciso
2205 Zambales, Phils 601

Attachments

8

# TREATY OF PEACE (TREATY OF PARIS)

*Signed at Paris December 10, 1898*
*Senate advice and consent to ratification February 6, 1899*
*Ratified by the President of the United States February 6, 1899*
*Ratified by Spain March 19, 1899*
*Ratifications exchanged at Washington April 11, 1899*
*Entered into force April 11, 1899*
*Proclaimed by the President of the United States April 11, 1899*
*Article IX amended by protocol of March 29, 1900* [1]
*Article III supplemented by convention of November 7, 1900* [2]

30 Stat. 1754; Treaty Series 343

The United States of America and Her Majesty the Queen Regent of Spain, in the name of her August Son Don Alfonso XIII, desiring to end the state of war now existing between the two countries, have for that purpose appointed as Plenipotentiaries:

The President of the United States,

William R. Day, Cushman K. Davis, William P. Frye, George Gray, and Whitelaw Reid, citizens of the United States;

and Her Majesty the Queen Regent of Spain,

Don Eugenio Montero Ríos, President of the Senate,

Don Buenaventura de Abarzuza, Senator of the Kingdom and ex-Minister of the Crown,

Don José de Garnica, Deputy to the Cortes and Associate Justice of the Supreme Court,

Don Wenceslao Ramírez de Villa-Urrutia, Envoy Extraordinary and Minister Plenipotentiary at Brussels, and

Don Rafael Cerero, General of Division;

Who, having assembled in Paris, and having exchanged their full powers, which were found to be in due and proper form, have, after discussion of the matters before them, agreed upon the following articles:

[1] TS 344, *post*, p. 622.
[2] TS 345, *post*, p. 623.

615

08 1318
**FILED**

JUL 3 1 2008

Clerk, U.S. District and
Bankruptcy Courts

Case 1:08-cv-01118-JDB    Document 1-2    Filed 07/31/2008    Page 2 of 15

merchandise to the ports of the Philippine Islands on the same terms as ships and merchandise of the United States.

### ARTICLE V

The United States will, upon the signature of the present treaty, send back to Spain, at its own cost, the Spanish soldiers taken as prisoners of war on the capture of Manila by the American forces. The arms of the soldiers in question shall be restored to them.

Spain will, upon the exchange of the ratifications of the present treaty, proceed to evacuate the Philippines, as well as the island of Guam, on terms similar to those agreed upon by the Commissioners appointed to arrange for the evacuation of Porto Rico and other islands in the West Indies, under the Protocol of August 12, 1898,⁴ which is to continue in force until its provisions are completely executed.

The time within which the evacuation of the Philippine Islands and Guam shall be completed shall be fixed by the two Governments. Stands of colors, uncaptured war vessels, small arms, guns of all calibres, with their carriages and accessories, powder, ammunition, livestock, and materials and supplies of all kinds, belonging to the land and naval forces of Spain in the Philippines and Guam, remain the property of Spain. Pieces of heavy ordnance, exclusive of field artillery, in the fortifications and coast defences, shall remain in their emplacements for the term of six months, to be reckoned from the exchange of ratifications of the treaty; and the United States may, in the mean time, purchase such material from Spain, if a satisfactory agreement between the two Governments on the subject shall be reached.

### ARTICLE VI

Spain will, upon the signature of the present treaty, release all prisoners of war, and all persons detained or imprisoned for political offences, in connection with the insurrections in Cuba and the Philippines and the war with the United States.

Reciprocally, the United States will release all persons made prisoners of war by the American forces, and will undertake to obtain the release of all Spanish prisoners in the hands of the insurgents in Cuba and the Philippines.

The Government of the United States will at its own cost return to Spain and the Government of Spain will at its own cost return to the United States, Cuba, Porto Rico, and the Philippines, according to the situation of their respective homes, prisoners released or caused to be released by them, respectively, under this article.

---

⁴ TS 343½, *ante*, p. 613.

Case 1:08-cv-01818-JDB    Document 1-2    Filed 07/31/2008    Page 3 of 15

## ARTICLE IX

Spanish subjects, natives of the Peninsula, residing in the territory over which Spain by the present treaty relinquishes or cedes her sovereignty, may remain in such territory or may remove therefrom, retaining in either event all their rights of property, including the right to sell or dispose of such property or of its proceeds; and they shall also have the right to carry on their industry, commerce and professions, being subject in respect thereof to such laws as are applicable to other foreigners. In case they remain in the territory they may preserve their allegiance to the Crown of Spain by making, before a court of record, within a year from the date of the exchange of ratifications of this treaty,[*] a declaration of their decision to preserve such allegiance; in default of which declaration they shall be held to have renounced it and to have adopted the nationality of the territory in which they may reside.

The civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by the Congress.

## ARTICLE X

The inhabitants of the territories over which Spain relinquishes or cedes her sovereignty shall be secured in the free exercise of their religion.

## ARTICLE XI

The Spaniards residing in the territories over which Spain by this treaty cedes or relinquishes her sovereignty shall be subject in matters civil as well as criminal to the jurisdiction of the courts of the country wherein they reside, pursuant to the ordinary laws governing the same; and they shall have the right to appear before such courts, and to pursue the same course as citizens of the country to which the courts belong.

## ARTICLE XII

Judicial proceedings pending at the time of the exchange of ratifications of this treaty in the territories over which Spain relinquishes or cedes her sovereignty shall be determined according to the following rules:

1.  Judgments rendered either in civil suits between private individuals, or in criminal matters, before the date mentioned, and with respect to which there is no recourse or right of review under the Spanish law, shall be deemed to be final, and shall be executed in due form by competent authority in the territory within which such judgments should be carried out.

2.  Civil suits between private individuals which may on the date mentioned be undetermined shall be prosecuted to judgment before the court

---

[*] For an extension of time for declaration of intention to retain Spanish nationality, see protocol of Mar. 29, 1900 (TS 344), *post*, p. 622.

TREATY OF PEACE—DECEMBER 10, 1898          621

In faith whereof, we, the respective Plenipotentiaries, have signed this treaty and have hereunto affixed our seals.

Done in duplicate at Paris, the tenth day of December, in the year of Our Lord one thousand eight hundred and ninety eight.

| | |
|---|---|
| William R. Day | [seal] |
| Cushman K. Davis | [seal] |
| Wm. P. Frye | [seal] |
| Geo. Gray | [seal] |
| Whitelaw Reid | [seal] |
| Eugenio Montero Ríos | [seal] |
| B. de Abarzuza | [seal] |
| J. de Garnica | [seal] |
| W. R. de Villa Urrutia | [seal] |
| Rafael Cerero | [seal] |

494

the British Empire, France, and Japan relating to their insular possessions and insular dominions in the region of the Pacific Ocean, 43 Stat. 1646; 4 Treaties, etc. (Trenwith, 1938) 4820. Replying on April 3, 1924 the Department of State said:

> The controversies referred to in [the treaty] . . . do not, as indicated in the declaration accompanying the Treaty, embrace questions which, under the principles of international law, lie exclusively within the domestic jurisdiction of the respective powers. The question whether independence shall be granted to the Philippine Islands is one which lies exclusively within the domestic jurisdiction of the United States. I, therefore, do not consider that the Treaty mentioned, the declaration accompanying the Treaty, or the Treaty supplementary thereto, concluded February 6, 1922, in any manner affect the exclusive right of this Government to withhold or to grant independence to the Islands in question.

> Representative Fairfield to Secretary Hughes, Mar. 25, 1924, and Mr. Hughes to Mr. Fairfield, Apr. 3, 1924, MS. Department of State, file 811b.01/63.

No treaty obligation

In a communication of October 3, 1930, addressed to the Department of State, it was asked whether there was any obligation under any treaty entered into at any time on the part of the United States, either with Spain or directly with the Philippine people, wherein the United States was in any manner bound to a promise of independence of the Islands. Replying on October 10, 1930 the Department said that—

> there is no treaty provision by which the United States promises the independence of the Philippine Islands. Such independence lies wholly in the discretion of the United States to be exercised through the appropriate Constitutional method. The United States has made no agreement on the subject nor has there been any authoritative or official promise on the subject by either the executive or Congress. The Sixty-fourth Congress in a preamble to the present Organic Act (Statutes at Large, Vol. 39, Part I, p. 545) on this subject and various Presidents have made statements as to the ultimate purpose of the United States in certain circumstances or conditions. No such statements, of course, constitute an official commitment of the Government.

> Representative McCormick to the Department of State, Oct. 3, 1930, and Assistant Secretary Castle to Mrs. McCormick, Oct. 10, 1930, MS. Department of State, file 811b.01/139.

Act of 1933

On January 17, 1933 the so-called "Hare-Hawes-Cutting act", to enable the people of the Philippine Islands to adopt a constitution and form a government, to provide for the independence of the islands, and for other purposes, was passed by Congress over a presidential veto (47 Stat. 761–770). The act provided that it should not

496                 CHAPTER IV—TERRITORY AND GOVERNMENT OF STATES

**High Commissioner**

The act authorizes the President to appoint, by and with the advice and consent of the Senate, a United States High Commissioner to the government of the Commonwealth of the Philippine Islands, to be the representative of the President in the Islands, to have access to the records of the government of the Commonwealth, and to be furnished by the Chief Executive of the Commonwealth with such information as he shall request. The government of the Commonwealth is authorized to be represented in the United States by a Resident Commissioner with a non-voting seat in the House of Representatives. (Sec. 7.)

**Independence in ten years**

Section 10 of the act stipulates that on the fourth day of July immediately following the expiration of a period of ten years from the date of the inauguration of the government of the Commonwealth, the President of the United States "shall by proclamation withdraw and surrender all right of possession, supervision, jurisdiction, control, or sovereignty then existing and exercised by the United States in and over the territory and people of the Philippine Islands . . . and, on behalf of the United States, shall recognize the independence of the Philippine Islands as a separate and self-governing nation and acknowledge the authority and control over the same of the government instituted by the people thereof, under the constitution then in force".

**Neutralization**

Section 11 requests the President of the United States, at the earliest practicable date, to enter into negotiations with foreign powers with a view to the conclusion of a treaty for the perpetual neutralization of the Philippine Islands, if and when Philippine independence shall have been achieved. Section 12 provides that upon the proclamation and recognition of the independence of the Philippine Islands, the President shall notify foreign governments thereof and invite their recognition of such independence.

Section 15 repeals certain laws and parts of laws and provides for the continuance in force of others until they shall be altered, amended, or repealed by the Legislature of the Commonwealth of the Philippine Islands or by the Congress of the United States.

A concurrent resolution accepting the act was adopted by the Senate and House of Representatives of the Philippine Legislature in joint session on May 1, 1934.

**Constitution approved**

A Constitution of the Philippines was adopted by a Philippine constitutional convention on February 8, 1935. On March 23, 1935, the President of the United States notified the Governor General of the Philippine Islands that the proposed Constitution had been submitted to him and that he certified that "the same conforms substantially with the provisions of the Act of Congress approval March 24, 1934".

with respect to their financial operations and their currency; and we continue to control their foreign relations. The power of review by this court over Philippine cases, as now provided by law, is not only continued, but is extended to all cases involving the Constitution of the Commonwealth of the Philippine Islands.

Thus, while the power of the United States has been modified, it has not been abolished. Moral responsibilities well may accompany the process of separation from this country; and, indeed, they may have been intensified by the new and perplexing problems which the Philippine people now will be called upon to meet as one of its results. The existence and character of the consequent obligations and the extent of the relief, if any, which should be afforded by the United States in respect of them, are matters, not for judicial but for Congressional consideration and determination.

301 U.S. (1937) 308, 312–314, 319–320.

As to the honors which should be accorded the President of the Philippine Commonwealth during a visit to a foreign state, the Department of State on January 29, 1937 said that—

> the Philippine Commonwealth is not an independent state and its President is not entitled to the honors usually accorded to a chief of state. Sovereignty of the Philippine Islands remains with the United States and the only official of the United States entitled to such honors is the President of the United States. When the Commonwealth Government was inaugurated, it was decided that the High Commissioner to the Philippine Islands, representing the President of the United States, should have precedence over the President of the Commonwealth and that both of those officials should be entitled in the Philippines to salutes of 19 guns.
>
> Until such time as the Philippine Commonwealth becomes entirely free and independent of the United States, it is expected that when honors are rendered any official of the Philippine Commonwealth, the flag of the United States be displayed.

Secretary Hull to Ambassador Johnson, Jan. 29, 1937 (telegram), MS. Department of State, file 811h.001 Quezon, Manuel L./55.

In circular instructions to certain diplomatic and consular officers on Apr. 23, 1937 Assistant Secretary Carr said:

"A ruling was made at the time of the inauguration of the Commonwealth Government establishing the rank of the President of the Philippine Commonwealth as analogous to that of a Governor of a State and providing that the President of the Commonwealth would rank with, but after, the United States High Commissioner to the Philippines.

"This same ruling also prescribed that both the United States High Commissioner and the President of the Philippine Commonwealth would be entitled to a salute of nineteen guns in Philippine territory or Philippine waters, on which occasion only the flag of the United States should be flown. In consequence, the President of the Philippine Commonwealth has

between the Philippine Islands and the United States during the transition period, while the United States remains sovereign in the islands. These provisions accord with the provisions contained in Section 2(a) of the Act of March 24, 1934. Thus the language of the 10th subsection of Section 1 of the ordinance is the same in phraseology as that of Section 2(a) (10) of the Act of March 24, 1934.

Both the Acts of Congress and the ordinance appended to the Constitution of the Philippines show clearly that it was intended that full sovereignty over the Philippines was to be retained by the United States during the transition period of ten years provided for in the Act. They show that, while the government of the Philippine Islands was to have a large measure of self-government, they were not to constitute a separate sovereign state under the rules of international law. In other words, it was clearly intended that the United States and the Philippine Islands should continue to constitute a single state. This is made clear, not only by the provision that the foreign affairs of the Philippines "shall be under the direct supervision and control of the United States", but also by the various other provisions contained in the Act, and repeated in the ordinance appended to the Constitution setting forth in detail the continued authority and responsibility of the United States in the Philippines during the transition period. Among them is the provision, to which special attention has already been called, under which the President of the United States may intervene for the preservation of the government of the Commonwealth of the Philippines, for the protection of life, property and liberty and "for the discharge of government obligations under and in accordance with the provisions of the constitution".

It is believed that it is the intent of the statutory provision in question that foreign affairs pertaining to the Philippine Islands are to be conducted and not merely supervised by the United States. The use of the adjective "direct" before the word "supervision" and the addition of the words "and control" seem to emphasize this point. Needless to say, the Government of the United States, acting through the High Commissioner to the Commonwealth of the Philippine Islands, may call upon the government of the latter for cooperation and assistance in matters pertaining to foreign affairs, including the extradition of criminals, as well as the protection of aliens in the islands, but it is believed that communications between the government of the islands and foreign governments must be carried on through the High Commissioner.

It may be well to make mention of the following provision of Section 10(9) of Article VIII of the Constitution of the Philippines:

"The President shall have power, with the concurrence of a majority of all the Members of the National Assembly, to make treaties, and with the consent of the Commission on appointments, he shall appoint ambassadors, other public ministers and

*Philippines not a sovereign state*


502                    CHAPTER IV—TERRITORY AND SOVEREIGNTY OF STATES

should, during the period in which the United States retains
sovereignty over the Philippines, deal directly with foreign
governments in matters relating to the extradition of criminals.

The Acting Attorney General (Keenan) to the Secretary of State
(Hull), Apr. 30, 1935, MS. Department of State, File 200.11B/13; Mr. Hull
to Attorney General Cummings, May 29, 1935, *ibid.* 200.11B/10, enclosing
a memorandum prepared in the Office of the Legal Adviser (200.11B/15).

With reference to the question of granting a visa to a member of the
household of President Quezon of the Philippine Commonwealth, the De-
partment of State on June 3, 1937 said:

"Philippine Government officials are considered to be foreign government
officials for visa purposes in view of [the] language **of** [the] Philippine
Independence Act."

Secretary Hull to Consul General Southard, June 3, 1937 (telegram),
MS. Department of State, File 811 111 Diplomatic/10231.


# GUANO ISLANDS

## §77

The Department of State expressed the following opinion in 1907
regarding the legal status of guano islands appertaining to the United
States:

. . . the United States possess no sovereign or territorial
rights over guano islands. United States citizens who discover
guano, or their assigns, are protected by this Government in the
prosecution of their enterprise which extends only to appropria-
tion and disposal of the guano thereon. This protection is ex-
tended under the Acts of Congress on the subject, compiled in
Title 72 of the Revised Statutes of the United States.

The Assistant Secretary of State (Bacon) to Messrs. Dudley and Mich-
ener, Jan. 3, 1907, MS. Department of State, file 3120.

To the same effect, see the Acting Secretary of State (Adee) to Mr.
Miles Carpenter, July 22, 1907, *ibid.* Minor File, vol. 12; the Third Assist-
ant Secretary of State (Phillips) to Mr. H. M. Walker, July 13, 1914,
*ibid.* file 811.0141/11; the Acting Secretary of State (Phillips) to Represen-
tative John Jacob Rogers, Apr. 25, 1922, *ibid.* 811.0141SW2/77; the Acting
Secretary of State (Grew) to Mr. R. F. Nichols, Sept. 1, 1922, *ibid.*
811.0141/51.

The act of August 18, 1856 (Sections 5570–78 R.S.; sections
1411–19, Title 48 U.S.C.) does not vest title to any of the Guano
Islands to which it applies in the discoverer but merely au-
thorizes the President, in his discretion, to protect the discoverer
or his assigns in the exclusive right of occupying such island,
rocks or keys for the purpose of obtaining guano and of selling
and delivering the same to the United States to be used therein.
In Duncan v. Navassa Phosphate Company (137 U.S. 617), the
Supreme Court of the United States said, "The whole right con-



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Office of Federal Operations
P. O. Box 19848
Washington, D.C. 20036

Rogelio Acosta,
Complainant,

v.

Dr. Donald C. Winter,
Secretary,
Department of the Navy,
Agency.

Request No. 0520080439

Appeal No. 0120080961

Agency No. 07-61581-02250

## DENIAL

Complainant timely requested reconsideration of the decision in *Rogelio Acosta v. Department of the Navy*, EEOC Appeal No. 0120080961 (March 14, 2008). EEOC Regulations provide that the Commission may, in its discretion, grant a request to reconsider any previous Commission decision where the requesting party demonstrates that: (1) the appellate decision involved a clearly erroneous interpretation of material fact or law; or (2) the appellate decision will have a substantial impact on the policies, practices, or operations of the agency. *See* 29 C.F.R. § 1614.405(b).

After reconsidering the previous decision and the entire record, the Commission finds that the request fails to meet the criteria of 29 C.F.R. § 1614.405(b), and it is the decision of the Commission to deny the request. The decision in EEOC Appeal No. 0120080961 remains the Commission's final decision. There is no further right of administrative appeal on the decision of the Commission on this request.

## COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (P0900)

This decision of the Commission is final, and there is no further right of administrative appeal from the Commission's decision. You have the right to file a civil action in an appropriate United States District Court **within ninety (90) calendar days** from the date that you receive this decision. If you file a civil action, you must name as the defendant in the complaint the person who is the official agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court.

2                                    0520080439

"Agency" or "department" means the national organization, and not the local office, facility or department in which you work.

<u>RIGHT TO REQUEST COUNSEL</u> (Z1199)

If you decide to file a civil action, and if you do not have or cannot afford the services of an attorney, you may request that the Court appoint an attorney to represent you and that the Court permit you to file the action without payment of fees, costs, or other security.  *See* Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, 794(c).  **The grant or denial of the request is within the sole discretion of the Court.**  Filing a request for an attorney does not extend your time in which to file a civil action.  Both the request and the civil action must be filed within the time limits as stated in the paragraph above ("Right to File a Civil Action").

FOR THE COMMISSION:

*Carlton M. Hadden*

Carlton M. Hadden, Director
Office of Federal Operations

MAY 5 - 2008



DEPARTMENT OF THE NAVY
HUMAN RESOURCES OFFICE
(YOKOSUKA, JAPAN)
PSC 473, Box 22, N134
FPO AP 96349-0022

N134
5 Nov 07

From: Deputy Equal Employment Opportunity Officer, Human
      Resource Office - Yokosuka, Japan
To:   Rufus Nobles LLC, San Narciso, 2205 Zambales,
      Philippines 601

Subj: NOTICE OF DISMISSAL OF FORMAL COMPLAINT OF ROGELIO
      ACOSTA V. THE HONORABLE DONALD C. WINTER, SECRETARY OF
      THE NAVY, DON # 07-61581-02250

Ref:  (a) Discrimination Complaint dtd 21 Sep 07
      (b) Notice of Receipt of Formal Complaint dtd 28 Sep 07
      (c) Notice of Final Interview dtd 15 Aug 07
      (d) 29 CFR § 1614

Encl: (1) Notice of Appeal/Petition (EEOC Form 573)
      (2) Counselor's Report

1.  Your client's formal discrimination complaint, identified
as reference (a), was signed by your client on 30 August 2007,
received by this office on 21 September 2007, and acknowledged
by reference (b).

2. Based upon review of reference (a) and in accordance with
reference (d), I am hereby dismissing your client's
discrimination complaint for failure to state a claim and for
untimely contact.

     a. Failure to State a Claim: In reference (a) your client
claims he was discriminated against on the basis of reprisal,
but provided no date or description of any prior EEO activity
he engaged in as either a complainant or witness.  The Equal
Employment Opportunity Commission (EEOC) has held that a
complainant can establish a prima facie case of reprisal by
showing that: (1) he engaged in protected EEO activity; (2)
the agency was aware of his protected activity; (3) he was
subject to an adverse action; and (4) the adverse action
followed his protected activity within such a period of time
that a retaliatory motivation may be inferred.  Your client

Subj:  NOTICE OF DISMISSAL OF FORMAL COMPLAINT OF ROGELIO
       ACOSTA V. THE HONORABLE DONALD C. WINTER, SECRETARY OF
       THE NAVY, DON # 07-61581-02250

never provided any examples of times he engaged in a protected
EEO activity; as either a witness or a complainant and
therefore, your client's claim of discrimination is hereby
dismissed for failure to state a claim in accordance with 29
CFR 1614.107(a)1.

    b. Failure to State a Claim: your client claims he was
discriminated against on the basis of reprisal on 8 January
1988, when management did not accord him retirement coverage
under the Civil Service Retirement Act when he retired.   29
CFR 1614.103(d)4 states that "Aliens employed in positions, or
who apply for positions, located outside the limits of the
United States" are not covered under Title VII.  Your client
has provided no evidence to show he is a citizen of the United
States, either by birth or naturalized.  Under the EEOC's
regulatory pre-complaint procedures, EEO counseling is a
mandatory first step to pursuing a claim of discrimination in
the EEO process, and the agency must provide the counseling to
any "aggrieved person" who requests it. See 29 CFR 1614.104.
The Commission has, nevertheless, held consistently that
claims of unlawful discrimination brought by foreign nationals
employed by agencies outside the United States do not come
within the purview of the EEOC Regulations. Fogarty v.
Department of State, Appeal No. 01974143 (August 6, 1998);
Bethune v. Panama Canal Commission, Request No. 05940402,
(July 15, 1994); Howell v. Department of State, Appeal No.
01930262 (December 18, 1992).  Therefore, your client's claim
of discrimination is hereby dismissed for failure to state a
claim in accordance with 29 CFR 1614.103, 1614.104 and
1614.105.

    c. Untimely contact:  your client claims he was
discriminated against on the basis of reprisal when management
did not accord him retirement coverage under the Civil Service
Retirement Act.  Your client claims he retired on 3 July 1992,
and further states the date on which the most recent alleged
discrimination occurred is 8 January 1988; over four years
prior to his retirement.  29 CFR 1614.105 states that an
aggrieved person must initiate contact with an EEO Counselor
within 45 days of the date of the matter alleged to be
discriminatory or, in the case of personnel action, within 45
days of the effective date of the action.  Your client's first
contact with a counselor was in a letter to the Equal
Employment Manager, Human Resource Office Yokosuka in a letter
dated 22 June 2007, which is more than over 15 years after he

Subj:  NOTICE OF DISMISSAL OF FORMAL COMPLAINT OF ROGELIO
       ACOSTA V. THE HONORABLE DONALD C. WINTER, SECRETARY OF
       THE NAVY, DON # 07-61581-02250

retired and more than 19 years since the date he claims the
most recent act of alleged discrimination occurred.  Therefore,
your client's claim of discrimination is hereby dismissed for
untimely contact in accordance with 29 CFR 1614.105(a)1.

3. As you are not a prevailing party, no attorney fees are
awarded in connection with your discrimination complaint.

4. This is the final department of Navy decision on your
complaint.  If you are dissatisfied with the decision to
dismiss your complaint, you may file a notice of appeal with
the Equal Employment Opportunity Commission ("the Commission")
within thirty (30) calendar days of your receipt of this
decision.  Enclosure (2) should be used when filing your
appeal.  The appeal form should be submitted to:

                Director, Office of Federal Operations
                Equal Employment Opportunity Commission
                         P.O. Box 19848
                       Washington, D.C. 20036

5. At the same time that you file your appeal with the
Commission, you must provide a copy of the appeal and all
supporting statements to this office at EEO N134, PSC 473 Box
22, FPO AP 96349-0022, within 30 calendar days of filing the
Notice of Appeal, enclosure (2).

6. An appeal shall be deemed filed on the day it is postmarked,
or, in the absence of a postmark, on the date it is received
by the Commission.  The 30 calendar-day time limit within
which an appeal must be filed will not normally be extended by
the Commission.  If the appeal is not submitted within the
time limit, the Commission may extend the time limit if a
written explanation showing that you were not notified of the
prescribed time limit, were not otherwise aware of it, or
circumstances beyond your control prevented you from filing
the Notice of Appeal within the prescribed time limit.  A copy
of your explanation must be forwarded to the EEO Office.

7. If you elect not to appeal to the Commission, you may file
a civil action in an appropriate U.S. District Court within 90
calendar days of your receipt of this decision.  Filing a
civil action will result in termination of the administrative
processing of your complaint.

Subj: NOTICE OF DISMISSAL OF FORMAL COMPLAINT OF ROGELIO
ACOSTA V. THE HONORABLE DONALD C. WINTER, SECRETARY OF
THE NAVY, DON # 07-61581-02250

8. If you file a civil action under Title VII of the Civil
Rights Act of 1964, as amended, or the Rehabilitation Act of
1973, as amended, and do not have, or are unable to obtain the
services of a lawyer, you may request the court to appoint a
lawyer to represent you.  In such circumstances as the court
may deem just, the court may appoint a lawyer and ay authorize
the commencement of the action without the payment of fees,
costs, or security.  Any such request must be made within the
above-referenced 90 calendar day time limit, for filing suit
and in such form and manner as the court may require.  Filing
a request for an attorney does not extend your time in which
to file a civil action.  Both the request and the civil action
must be filed within 90 calendar days from the date you
receive this decision.

9. If you file an appeal with the Commission, you may still
file a civil action in U.S. District Court within thirty (3)
calendar days of your receipt of the Commission's final
decision on y our appeal.  A civil action may also be filed
any time after 180 calendar days from the date of filing your
appeal to the Commission, if a final decision has not bee
issued by the Commission's Office of Federal Operations.

10. You are further notified that if you file a civil action,
you must name DONALD C. WINTER, Secretary of the Navy, as the
defendant.  You must include the name of the person and the
official title.  Failure to name DONALD C. WINTER, Secretary
of the Navy, may result in the loss of any judicial redress
you may be entitled to.

11. Thomas LaBelle, EEO Specialist, is the point of contact
for this complaint and you may reach him by mail at HRO
Yokosuka, PSC 473, Box 22, Code N134, FPO AP 96349-0022, or by
email at Thomas.labelle@fe.navy.mil.

JUNARION HUBBARD

Copy to (w/o encl):
R. Acosta

## I (a) PLAINTIFFS

Rogelio Acosta

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _99999_
**(EXCEPT IN U.S. PLAINTIFF CASES)**

Pro se (N/A)

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

## DEFENDANTS

Honorable Donald C. Winter

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
**(IN U.S. PLAINTIFF CASES ONLY)**
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRA...

Case: 1:08-cv-01318
Assigned To : Bates, John D.
Assign. Date : 7/31/2008
Description: Employ. Discrim.

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

□ 1 U.S. Government
Plaintiff

□ 3 Federal Question
(U.S. Government Not a Party)

⊗ 2 U.S. Government
Defendant

□ 4 Diversity
(Indicate Citizenship of Parties
in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | □ 1 | □ 1 | Incorporated or Principal Place of Business in This State | □ 4 | □ 4 |
| Citizen of Another State | □ 2 | □ 2 | Incorporated and Principal Place of Business in Another State | □ 5 | □ 5 |
| Citizen or Subject of a Foreign Country | □ 3 | □ 3 | Foreign Nation | □ 6 | □ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

### □ A. Antitrust

□ 410 Antitrust

### □ B. Personal Injury/ Malpractice

□ 310 Airplane
□ 315 Airplane Product Liability
□ 320 Assault, Libel & Slander
□ 330 Federal Employers Liability
□ 340 Marine
□ 345 Marine Product Liability
□ 350 Motor Vehicle
□ 355 Motor Vehicle Product Liability
□ 360 Other Personal Injury
□ 362 Medical Malpractice
□ 365 Product Liability
□ 368 Asbestos Product Liability

### □ C. Administrative Agency Review

□ 151 Medicare Act

**Social Security:**
□ 861 HIA ((1395ff)
□ 862 Black Lung (923)
□ 863 DIWC/DIWW (405(g)
□ 864 SSID Title XVI
□ 865 RSI (405(g)

**Other Statutes**
□ 891 Agricultural Acts
□ 892 Economic Stabilization Act
□ 893 Environmental Matters
□ 894 Energy Allocation Act
□ 890 Other Statutory Actions (If
Administrative Agency is Involved)

### □ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

## □ E. General Civil (Other) OR □ F. Pro Se General Civil

**Real Property**
□ 210 Land Condemnation
□ 220 Foreclosure
□ 230 Rent, Lease & Ejectment
□ 240 Torts to Land
□ 245 Tort Product Liability
□ 290 All Other Real Property

**Personal Property**
□ 370 Other Fraud
□ 371 Truth in Lending
□ 380 Other Personal Property Damage
□ 385 Property Damage Product Liability

**Bankruptcy**
□ 422 Appeal 28 USC 158
□ 423 Withdrawal 28 USC 157

**Immigration**
□ 462 Naturalization Application
□ 463 Habeas Corpus- Alien
Detainee
□ 465 Other Immigration Actions

**Prisoner Petitions**
□ 535 Death Penalty
□ 540 Mandamus & Other
□ 550 Civil Rights
□ 555 Prison Condition

**Property Rights**
□ 820 Copyrights
□ 830 Patent
□ 840 Trademark

**Federal Tax Suits**
□ 870 Taxes (US plaintiff or
defendant

□ 871 IRS-Third Party 26
USC 7609

**Forfeiture/Penalty**
□ 610 Agriculture
□ 620 Other Food &Drug
□ 625 Drug Related Seizure of
Property 21 USC 881
□ 630 Liquor Laws
□ 640 RR & Truck
□ 650 Airline Regs
□ 660 Occupational
Safety/Health
□ 690 Other

**Other Statutes**
□ 400 State Reapportionment
□ 430 Banks & Banking
□ 450 Commerce/ICC
Rates/etc.

□ 460 Deportation
□ 470 Racketeer Influenced & Corrupt
Organizations
□ 480 Consumer Credit
□ 490 Cable/Satellite TV
□ 810 Selective Service
□ 850 Securities/Commodities/
Exchange
□ 875 Customer Challenge 12 USC
3410
□ 900 Appeal of fee determination
under equal access to Justice
□ 950 Constitutionality of State
Statutes
□ 890 Other Statutory Actions (if not
Administrative Agency Review
or Privacy Act)

3

| □ G. *Habeas Corpus/* *2255* | ⊙ H. *Employment* *Discrimination* | □ I. *FOIA/PRIVACY* *ACT* | □ J. *Student Loan* |
|---|---|---|---|
| □ 530 Habeas Corpus-General □ 510 Motion/Vacate Sentence | ■ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)  *(If pro se, select this deck)* | □ 895 Freedom of Information Act □ 890 Other Statutory Actions (if Privacy Act)  *(If pro se, select this deck)* | □ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| □ K. *Labor/ERISA* *(non-employment)* | □ L. *Other Civil Rights* *(non-employment)* | □ M. *Contract* | □ N. *Three-Judge Court* |
|---|---|---|---|
| □ 710 Fair Labor Standards Act □ 720 Labor/Mgmt. Relations □ 730 Labor/Mgmt. Reporting & Disclosure Act □ 740 Labor Railway Act □ 790 Other Labor Litigation □ 791 Empl. Ret. Inc. Security Act | □ 441 Voting (if not Voting Rights Act) □ 443 Housing/Accommodations □ 444 Welfare □ 440 Other Civil Rights □ 445 American w/Disabilities-Employment □ 446 Americans w/Disabilities-Other | □ 110 Insurance □ 120 Marine □ 130 Miller Act □ 140 Negotiable Instrument □ 150 Recovery of Overpayment & Enforcement of Judgment □ 153 Recovery of Overpayment of Veteran's Benefits □ 160 Stockholder's Suits □ 190 Other Contracts □ 195 Contract Product Liability □ 196 Franchise | □ 441 Civil Rights-Voting (if Voting Rights Act) |

**ⓧ ORIGIN**

⊙ 1 Original Proceeding  □ 2 Removed from State Court  □ 3 Remanded from Appellate Court  □ 4 Reinstated or Reopened  □ 5 Transferred from another district (specify)  □ Multi district Litigation  □ 7 Appeal to District Judge from Mag. Judge

---

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

*42 USC 2000   Employment Discrimination*

---

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A CLASS   □   ACTION UNDER F.R.C.P. 23      **DEMAND $**   Check YES only if demanded in complaint   **JURY DEMAND:** □ YES  ☒ NO

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   □ YES  ⊙ NO   If yes, please complete related case form.

**DATE** *7/31/08*   **SIGNATURE OF ATTORNEY OF RECORD** *NCD*

---

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

\forms\js-44.wpd